OAKLEY, INC., Plaintiff–Appellee,

v.

SUNGLASS HUT INTERNATIONAL, Lenscrafters, Inc., Ray Ban Sun Optics, Luxottica Group S.p.A., and Leonardo Del Vecchio, Defendants–Appellants.

No. 02–1132.

United States Court of Appeals, Federal Circuit.

Jan. 9, 2003.

Joseph F. Jennings, Knobbe, Martens, Olson & Bear, LLP, of Newport Beach, CA, argued for plaintiff-appellee. With him on the brief were Gerard von Hoffmann, III, Paul N. Conover, and Joseph S. Cianfrani. Of counsel on the brief were Gregory L. Weeks, Janet Robertson Kaufman, and Gregory K. Nelson, Weeks, Kaufman & Johnson, of Solana Beach, CA.

John M. Benassi, Brobeck, Phleger & Harrison LLP, of San Diego, CA, argued for defendants-appellants. With him on the brief were Franklin D. Ubell, and Colbern C. Stuart, III. Of counsel on the brief was Joseph DiBenedetto, Winston & Strawn, of New York, NY. Of counsel was Anthony W. Shaw, Brobeck, Phleger & Harrison LLP, of Washington, DC.

Before NEWMAN, LOURIE, and DYK, Circuit Judges.

Opinion for the court filed by Circuit Judge LOURIE. Concurring opinion filed by Circuit Judge DYK.

LOURIE, Circuit Judge.

Sunglass Hut International, Lenscrafters, Inc., Ray Ban Sun Optics, Luxottica Group S.p.A., and Leonardo Del Vecchio (collectively, "Sunglass Hut") appeal from the decision of the United States District Court for the Central District of California granting a preliminary injunction affecting certain of the defendants' sunglass lenses that the court held to be likely to infringe Oakley's U.S. Patent 5,054,902. *Oakley Inc. v. Sunglass Hut Int'l*, 61 USPQ2d 1658, 1662, 1669 (C.D.Cal.2001). Because the court did not abuse its discretion in ordering the injunction, and because the injunction is not otherwise infirm, we affirm.

## BACKGROUND

Oakley owns the '902 patent, issued to William J. King and directed to a sunglass lens. The claimed lens comprises three layers: a substrate, a middle semireflec-

tive layer, and an outer dielectric layer. '902 patent, col. 23, ll. 56–66. The reflectance of the semireflective layer and the thickness of the dielectric layer must be such that a "vivid colored appearance" is produced by an interference "differential effect" of light reflected from the lens. *Id.* at col. 23, l. 67 to col. 24, l. 66. Claim 1 of the patent, which defines the invention in terms of those limitations, reads as follows:

1. A lens for sunglasses to be worn by a wearer, comprising

a light transmissive substrate constituting the lens body, and having a first side for facing the wearer and a second side of [sic] facing outwardly from the wearer,

a semireflective layer intimately bonded to the second side, and

a dielectric layer over said semireflective layer, said dielectric layer being of substantially uniform thickness,

the reflectance of said semireflective layer and the thickness of said dielectric layer producing, at one or more wavelengths, a *differential effect* in intensity, of reflected light incident upon said lens from the direction faced by said second side, by interference between incident light reflected from said dielectric layer and light transmitted through said dielectric layer and reflected from said smireflecting [sic] layer, said differential effect altering the spectral distribution of light in an amount for producing a *vivid colored appearance* formed by said two layers when viewing toward the wearer from the direction faced by said second side.

*Id.* at col. 23, l. 55 col. 24, l. 66 (emphases added).

The optics of the differential effect is illustrated in Figure 6(a) of the patent, which follows:

FIG. 6(a)

As this drawing shows, light from the observer side of the lens is transmitted into a glass dielectric layer 8 towards the wearer (not shown). Within the dielectric layer 8, the light reflects successively between the two interfaces of the dielectric layer 8, each time with diminishing amplitude. Every internal reflection at the glass-air interface transmits light toward the observer, as depicted by rays $R_2$, $R_3$, and $R_4$. The phases of those light rays, after accounting for phase changes at interfaces, are dependent upon the thickness t of the dielectric layer 8, as that thickness determines the path lengths of the internal reflections. Furthermore, the reflectance of the semireflective layer 9 determines the strength of the internal reflections at the glass-air interface and hence the strength of the outwardly emanating rays $R_2$, $R_3$, and $R_4$. By choosing an appropriate thickness of the dielectric layer 8 (*i.e.*, t) and reflectance of the semireflective layer 9, the inventors were able to construct the lens such that the rays $R_2$, $R_3$, and $R_4$ constructively and destructively interfere with each other and with $R_1$ in varying strengths at given wavelengths. The invention of the '902 patent is the basic lens structure depicted in Figure 6(a) having a dielectric thickness and a semireflective reflectance value such that the cumulative effect of the interference among $R_1$, $R_2$, $R_3$, etc. is a "differential effect" producing a "vivid colored appearance" to the observer.

The specification sets forth a formula for calculating the "differential effect," also called "differential level," as follows:

$$\text{Differential Level} = (I_C - I_R)/I_R$$

where $I_C$ is the enhanced intensity of reflected light at a given wavelength $\lambda_C$, and $I_R$ is a reference intensity. *E.g.*, *id.* at col. 7, ll. 12–24. The enhanced intensity $I_C$ is the algebraic sum of the reflected rays $R_1$, $R_2$, $R_3$, etc. (*e.g.*, $I_C = R_1 + R_2 - R_3 + R_4$ for the lens shown in Figure 6(a), constructively interfering rays being added, and destructively interfering rays being subtracted). *See id.* at col. 10, ll. 25–28 (omitting the term $R_4$ because it is negligible). In the formula, different reference intensities are utilized throughout the '902 specification. For example, the formula is first introduced with "the random background intensity" $I_B$ (calculated as $I_B \sim R_1$) used as the reference. *Id.* at col. 7, ll. 12–24. Later, the specification calculates $I_B$ as $R_2 \sim [(R_1 + R_4) R_3]$. *Id.* at col. 9, ll. 48–58. In other places, the reference is at an "average noncoherent [wavelength] $\lambda_A$," calculated as $R_2 + \frac{1}{2}(R_1 R_3)$. *Id.* at col. 10, ll. 29–35, 66–68. In still other places, the specification utilizes as the reference the intensity of light at a different wavelength $\lambda_D$ that is reflected from the lens in a net destructive fashion. *E.g.*, *id.* at col. 10, ll. 42–54.

The '902 specification discloses a number of embodiments, and for each embodiment calculates a differential effect in multiple ways, under multiple circumstances. In the embodiment illustrated in Figure 6(a), reproduced above, in which the reflectance of the semireflective layer 9 is 20%, the specification calculates the differential effect to be 44% above $\lambda_D$ or 8.3% above $\lambda_A$. *Id.* at col. 10, ll. 15–54. When that same embodiment is additionally subjected to light incident from the back surface of the lens, the specification calculates the differential effect above $\lambda_D$ to be 7.5% in the worst case or 29.8% in a realistic case. *Id.* at col. 12, ll. 22–60. In a similar embodiment, in which the reflectance of the semireflective layer is 30%, the specification calculates the differential effect as 25.96% above $\lambda_D$ or 5.45% above $\lambda_A$. *Id.* at col. 10, l. 58 to col. 11, l. 12. In another embodi-

ment having a different dielectric material, the maximum differential effect is purported to be 405%. *Id.* at col. 11, l. 49.

In distinction to the claimed invention, which includes a "semireflective" middle layer, the patent disclaims the same basic three-layer lens structure having a middle layer that is highly reflective. Such a lens is illustrated in the specification's Figure 5(b), reproduced below:

## FIG. 5(b)
### (PRIOR ART)

As can be seen, the prior art depicted in Figure 5(b) includes a 90% reflectance middle layer 7 where the Figure 6(a) embodiment had a 20% reflectance middle layer 9. The specification calculates the maximum differential effect for that prior art lens to be 2.3%. *Id.* at col. 9, ll. 59–65. The specification explains that this is a poor result, stating: "Interference colors on such highly reflecting metal surfaces therefore tend to be weak or washed out to the eye because of the small differential intensities involved." *Id.* at col. 10, ll. 11–14.

During prosecution of the application that led to the '902 patent, the patent examiner rejected the claims as being unpatentable over U.S. Patent 3,679,291, issued to Joseph H. Apfel, et al. King overcame that rejection by amending the independent claim to include the phrase

"said differential effect altering the spectral distribution of light in an amount for producing a *vivid colored appearance* formed by said two layers when viewing toward the wearer from the direction faced by said second side." While acknowledging that Apfel disclosed a three-layer lens structure resembling his claimed lens structure, King distinguished Apfel's lens from his invention on the basis of the reflectance of the middle layer and the resulting vividness. Specifically, King represented to the examiner that Apfel's middle layer, being a material named IN-CONEL and having a thickness of 675 Angstroms, had a 94% reflectance. Thus, according to King, Apfel did not disclose or suggest his invention's "vividly colored reflected light produced by interference." The Patent and Trademark Office ("PTO") then issued the '902 patent, and the patentability of claim 1 was later confirmed in

a reexamination proceeding.[1]

Oakley manufactures sunglasses having metallic green and blue colored lenses that Oakley refers to as "Emerald" and "Ice" respectively. *See Oakley*, 61 USPQ2d at 1668–69. According to Oakley, those lenses have a "vivid colored appearance" and are covered by the '902 patent. Those sunglasses had been marketed exclusively by Sunglass Hut before Luxottica Group S.p.A. purchased Sunglass Hut. *See id.* After the purchase, Sunglass Hut began selling sunglasses manufactured by the other defendants, the lenses of which consist of a polycarbonate substrate with a polysiloxane hard coating, over which is applied a semireflective chromium layer, on which sits a silicon dioxide dielectric layer. *Id.* at 1662.

Alleging that the sunglasses newly marketed by Sunglass Hut contained infringing lenses, Oakley sued Sunglass Hut on November 6, 2001, for, *inter alia,* infringement of the '902 patent, and sought a temporary restraining order ("TRO") and a preliminary injunction. *Id.* at 1660. The court entered the TRO on November 20, and after briefing and argument, entered a preliminary injunction on December 3. *Id.* The preliminary injunction order stated: "Defendants ... are hereby enjoined from making, using, importing, selling, or offering to sell any products with Emerald (green) or Ice (blue) lenses that infringe the '902 patent." *Id.* at 1669.

In granting the preliminary injunction, the court made findings favorable to Oakley on the issues of irreparable harm, the balance of hardships, public interest, and likelihood of success on the merits. *Id.* at

1667–68. Sunglass Hut challenged Oakley's likelihood of success on the merits by arguing that the '902 patent was invalid and not infringed. More specifically, Sunglass Hut made the following invalidity arguments: (1) the phrase "vivid colored appearance" is indefinite, in violation of 35 U.S.C. § 112, ¶ 2, *id.* at 1666; (2) Apfel anticipates the '902 patent claims and King misrepresented Apfel to the PTO, *id.* at 1665; (3) certain Foster Grant sunglass lenses in existence more than one year before the filing of the application that led to the '902 patent anticipate the patent claims, *id.* at 1663; and (4) the claims would have been obvious, in violation of 35 U.S.C. § 103, in view of certain prior art references, *id.* at 1665. The court did not agree with Sunglass Hut that any of its arguments raised a substantial question of invalidity. *See id.* at 1667. On the issue of likelihood of infringement, the court did not accept Sunglass Hut's argument that King's prosecution comments regarding Apfel disclaimed coverage of its products, whose color peaks are less than Apfel's. *Id.* at 1663.

Sunglass Hut appeals from the district court's grant of the preliminary injunction. We have jurisdiction under 28 U.S.C. § 1292(c)(1) in view of 28 U.S.C. §§ 1292(a)(1) and 1295(a)(1).

## DISCUSSION

A decision to grant or deny a preliminary injunction is within the sound discretion of the district court, based upon its assessment of four factors: (1) the likelihood of the patentee's success on the merits; (2) irreparable harm if the injunc-

1. During reexamination, King corrected a typographical error, changing the word "smireflecting" to "semireflective," but did not otherwise amend claim 1. U.S. Patent B1 5,054,902, col. 1, l. 45 (reexamination certificate).

tion is not granted; (3) the balance of hardships between the parties; and (4) the public interest. *Amazon.com, Inc. v. Barnesandnoble.com, Inc.*, 239 F.3d 1343, 1350, 57 USPQ2d 1747, 1751 (Fed.Cir. 2001). We review the district court's decision for an abuse of discretion, a lapse that occurs when the decision is premised on an error of law, a clearly erroneous finding of fact, or a clear error of judgment in weighing the factors. *Id.* To the extent the court's decision depends upon an issue of law, we review that issue *de novo. Tate Access Floors, Inc. v. Interface Architectural Resources, Inc.*, 279 F.3d 1357, 1364, 61 USPQ2d 1647, 1652 (Fed.Cir.2002).

■■■ An assessment of the likelihood of infringement, like a determination of patent infringement at a later stage in litigation, requires a two-step analysis. "First, the court determines the scope and meaning of the patent claims asserted ... [Secondly,] the properly construed claims are compared to the allegedly infringing device." *Cybor Corp. v. FAS Techs., Inc.*, 138 F.3d 1448, 1454, 46 USPQ2d 1169, 1172 (Fed.Cir.1998) (en banc) (citations omitted). Step one, claim construction, is an issue of law, *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 970–71, 34 USPQ2d 1321, 1322 (Fed.Cir.1995) (en banc), *aff'd*, 517 U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996), that we review *de novo, Cybor*, 138 F.3d at 1456, 46 USPQ2d at 1172. Step two, comparison of the claim to the accused device, requires a determination that every claim limitation or its equivalent be found in the accused device. *Warner–Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 29, 117 S.Ct. 1040, 137 L.Ed.2d 146 (1997). Those determinations are questions of fact. *Bai v. L & L Wings, Inc.*, 160 F.3d 1350, 1353, 48 USPQ2d 1674, 1676 (Fed.Cir.1998).

■■■ An assessment of the likelihood of validity of a patent claim over the prior art also involves a two-step process. The first step is the same claim construction implicated in · an infringement analysis. *See Smiths Indus. Med. Sys., Inc. v. Vital Signs, Inc.*, 183 F.3d 1347, 1353, 51 USPQ2d 1415, 1418–19 (Fed.Cir.1999). The second step involves a comparison of the asserted claims with the prior art. A determination that a claim is invalid as being anticipated or lacking novelty under 35 U.S.C. § 102 requires a finding that "each and every limitation is found either expressly or inherently in a single prior art reference." *Celeritas Techs. Inc. v. Rockwell Int'l Corp.*, 150 F.3d 1354, 1360, 47 USPQ2d 1516, 1522 (Fed.Cir.1998). Whether a claim would have been obvious within the meaning of 35 U.S.C. § 103 is a question of law based on underlying findings of fact. *Smiths*, 183 F.3d at 1354, 51 USPQ2d at 1419–20 (citing *Graham v. John Deere Co.*, 383 U.S. 1, 17–18, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966)). We review a district court's underlying findings of fact for clear error, while we rule *de novo* on the ultimate issue of obviousness. *Id.* at 1355, 183 F.3d 1347, 51 USPQ2d at 1419–20. Because an issued patent is presumed to be valid, 35 U.S.C. § 282 (2000), the evidentiary burden to show facts supporting a conclusion of invalidity is clear and convincing evidence, *WMS Gaming Inc. v. Int'l Game Tech.*, 184 F.3d 1339, 1355, 51 USPQ2d 1385, 1396–97 (Fed.Cir.1999).

■■■ In the context of a preliminary injunction, while "the burden of proving invalidity is with the party attacking validity," the party seeking the injunction "retain[s] the burden of showing a reasonable likelihood that the attack on its patent's validity would fail." *H.H. Robertson Co. v. United Steel Deck, Inc.*, 820 F.2d 384, 387,

2 USPQ2d 1926 (Fed.Cir.1987). When the presumptions and burdens applicable at trial are taken into account, the injunction should not issue if the party opposing the injunction raises "a substantial question concerning infringement or validity, meaning that it asserts a defense that [the party seeking the injunction] cannot prove lacks substantial merit." *Tate Access Floors*, 279 F.3d at 1365, 61 USPQ2d at 1652 (internal quotation marks omitted); *New Eng. Braiding Co. v. A.W. Chesterton Co.*, 970 F.2d 878, 883, 23 USPQ2d 1622, 1626 (Fed.Cir.1992) ("While it is not the patentee's burden to prove validity, the patentee must show that the alleged infringer's defense lacks substantial merit").

■ Whether the terms of an injunction fulfill the mandates of Federal Rule of Civil Procedure 65(d) is a question of law that we review *de novo*. *Signtech USA, Ltd. v. Vutek, Inc.*, 174 F.3d 1352, 1356, 50 USPQ2d 1372, 1374 (Fed.Cir.1999) (citing *Additive Controls & Measurement Sys., Inc. v. Flowdata, Inc.*, 986 F.2d 476, 479–80, 25 USPQ2d 1798, 1801 (Fed.Cir.1993)).

Sunglass Hut argues in this appeal that it raised below substantial questions concerning, *inter alia*, the indefiniteness, anticipation, and noninfringement of the '902 patent claims. Sunglass Hut also contends that the court clearly erred in evaluating irreparable harm and the balance of hardships. Finally, Sunglass Hut contends that the court's injunctive order fails to comply with the specificity requirements of Fed.R.Civ.P. 65(d).

### A. *Claim Definiteness*

■ Sunglass Hut argues that the phrase "vivid colored appearance" appearing in claim 1 is indefinite. Even if vividness is based on the disclosed "differential effect," according to Sunglass Hut, one skilled in the art cannot tell which values of differential effect qualify as vivid and which do not. Sunglass Hut further contends that the district court did not and could not define the bounds of the phrase.

Oakley responds that the phrase can be defined from the structure, formula, and examples disclosed in the patent. Oakley cites the proposition that compliance with section 112, paragraph 2, does not require a particular number as a cutoff. According to Oakley, the specification's numerical examples, including some values of differential effect that do create a "vivid colored appearance" and one that does not, are sufficient.

■ We agree with Oakley that Sunglass Hut has not raised a substantial question as to whether the phrase "vivid colored appearance" renders the claims indefinite in violation of 35 U.S.C. § 112, ¶ 2. That paragraph provides: "The specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention." 35 U.S.C. § 112, ¶ 2 (2000). "The primary purpose of the definiteness requirement is to ensure that the claims are written in such a way that they give notice to the public of the extent of the legal protection afforded by the patent, so that interested members of the public, *e.g.*, competitors of the patent owner, can determine whether or not they infringe. That determination requires a construction of the claims according to the familiar canons of claim construction." *All Dental Prodx, LLC v. Advantage Dental Prods.*, 309 F.3d 774, 779–80, 64 USPQ2d 1945, 1949 (Fed.Cir. 2002) (citations omitted).

■ One of those canons is that claims are construed as one skilled in the

art would understand them in light of the specification of which they are a part. *Orthokinetics, Inc. v. Safety Travel Chairs, Inc.*, 806 F.2d 1565, 1575, 1 USPQ2d 1081, 1088 (Fed.Cir.1986). Indeed, a patentee may be his or her own lexicographer by defining the claim terms. Another one of those canons is that a patentee need not define his invention with mathematical precision in order to comply with the definiteness requirement. *In re Marosi,* 710 F.2d 799, 802–03, 218 USPQ 289, 292 (Fed. Cir.1983). In *Marosi,* we held that the phrase "essentially free of alkali metal" was not indefinite, where the specification defined it as containing only residual impurities, such as 4 ppm (parts per million). *Id.* at 802, 710 F.2d 799, 218 USPQ at 292. Marosi disclaimed a level of 3819 ppm disclosed in the prior art, and the PTO took the position that one skilled in the art would not know where to draw the line between 4 ppm and 3819 ppm. *Id.* We sided with Marosi, explaining that his invention "does not reside in such a number" and that a skilled artisan would draw that line between unavoidable impurities and essential ingredients. *Id.* at 803, 710 F.2d 799, 218 USPQ at 292.

Unlike the situation in *Marosi,* the numerical value of the differential effect in this case is a distinguishing feature over the prior art. That is so because the language of the claim associates vividness with the differential effect, and the specification presents examples of numerical values of the differential effect that either qualify as vivid or do not. More precisely, the language of the claim itself confirms that the lens's "vivid colored appearance" results directly from the "differential effect." '902 patent, col. 24, ll. 62–64 (reciting "said differential effect ... producing a vivid colored appearance" in claim 1). Moreover, the claim itself defines the lens's structural attributes that produce the "differential effect." *Id.* at col. 24, ll. 67–69 (reciting "the reflectance of said semireflective layer and the thickness of said dielectric layer producing ... a differential effect").

Accordingly, the specification presents a formula for calculating the differential effect for a number of examples in which the differential effect is either great enough to produce a "vivid colored appearance" or not. Those values that qualify as producing a "vivid colored appearance" range from 5.45% to 405% under various circumstances, whereas the only disclosed value of maximum differential effect that does not produce a "vivid colored appearance" is 2.3%. *Id.* at col. 9, ll. 59–65. Thus, while the specification does not indicate so explicitly, the dividing line must be somewhere between 2.3% and 5.45%. Although the difference between those values is seemingly slight, and comparison of one differential effect value to another may present an apples-to-oranges problem due to the different reference intensities involved, the specification purports to indicate that the difference is significant, brushing aside any comparison difficulties. *See* '902 patent, col. 11, ll. 5–16 (purporting that differential effects of 5.45% above $\lambda_D$ and 25.96% above $\lambda_A$ are *"much larger* than the ~ 2.2% found for the 90% reflecting case" (emphasis added)); *see also id.* at col. 12, ll. 37–40 (purporting that 7.5% is *"much greater* than that obtained (± 2.2%) for a 90% reflecting layer case" (emphasis added)). Faced with those examples and comments, we conclude that one skilled in the art would, in reasonable likelihood, understand that a lens exhibiting a maximum differential effect not substantially greater than 2.2% does not have a "vivid colored appearance."

Indeed, we conclude that one skilled in the art would interpret the phrase "vivid

colored appearance" in light of the specification to require that the maximum differential effect equal or exceed about 5.45%, and we thus construe the phrase for purposes of the preliminary injunction.

That is not to say that Sunglass Hut cannot ultimately succeed on the merits of its indefiniteness argument later in the litigation, after further development of the record. We simply hold that, recognizing the presumption of validity and the fact that the '902 patent has already been subjected to reexamination, Oakley has at this point in the case shown that it is reasonably likely to withstand such a validity challenge.

## B. *Anticipation*

### 1. *Apfel*

Sunglass Hut, once again attempting to take another bite at Apfel, argues that Apfel, particularly Figures 1–5 of the Apfel patent, anticipates claim 1. According to Sunglass Hut, the PTO allowed the '902 patent claims over Apfel only because King misrepresented to the PTO that Apfel's middle layer of INCONEL is 94% reflective, rather than "semireflective," as called for in claim 1. To support its allegation of misrepresentation, Sunglass Hut points to other, allegedly inconsistent statements by King concerning Apfel.

 Oakley responds that Apfel's middle layer is highly reflective and thus no different from the admitted prior art depicted in Figure 5(b) of the '902 patent. Oakley also contends that the PTO twice allowed the '902 patent claims over Apfel,

and that King's statements concerning the reflectivity of Apfel's INCONEL layer, when properly understood, are neither inconsistent nor misrepresentative of the facts of Apfel's disclosure.

Sunglass Hut's Apfel argument succeeds no better here than it has previously. We agree with Oakley that Apfel, like Figure 5(b), is different from what is claimed in the '902 patent. Apfel discloses a number of multilayer lenses, the relevant one of which is a three-layer lens depicted in Figure 1. '291 patent, fig. 1. The three layers are a substrate **21**, a metal layer **26**, and a dielectric layer **27**, in that order. *Id.* at col. 2, ll. 40–51. The metal layer **26** is further described as being INCONEL 67.5 millimicrons thick. *Id.* at col. 3, ll. 19–21, 28–30. Apfel states that an object of his invention is to provide "strong color." *Id.* at col. 1, ll. 33–36, col. 3, ll. 60–62. Whether Apfel's "strong color" equates with "vivid colored appearance" as that phrase is used in the '902 patent we need not decide,[2] for the '902 patent claims cover only three-layer lenses having a "vivid colored appearance," provided, *inter alia*, that the middle layer is "semireflective."

Sunglass Hut's only evidence that Apfel's metal layer **26** is "semireflective" seems to be King's deposition testimony that INCONEL's reflectance is "very low" and King's statements during prosecution of another patent application, in which Sunglass Hut contends that King stated that the same reflectance is 20%. Both of those statements, according to Sunglass Hut, contradict King's statement before the PTO during prosecution of the application that led to the '902 patent that Apfel's

**2.** Sunglass Hut argues that King admitted during his deposition that the terms "vivid" and "strong" are synonymous. We consider that testimony to be of little value in the

definiteness analysis or claim construction. *See Solomon v. Kimberly–Clark Corp.,* 216 F.3d 1372, 1379–80, 55 USPQ2d 1279, 1283–84 (Fed.Cir.2000).

metal layer **26** is a "thick metal layer (675 Angstroms of Inconel) which is essentially a mirror having 94% reflectance."

The district court found Sunglass Hut's evidence unconvincing, noting that the PTO twice allowed the '902 claims over Apfel. *Oakley,* 61 USPQ2d at 1665. We perceive no clear error in that finding. First, Sunglass Hut's interpretation of King's prosecution comments in the other patent application is a strained one. Secondly, King's apparently inconsistent deposition comment can be squared with his prosecution statements by the fact that the reflectance of a layer of INCONEL depends upon the thickness of the layer.

In sum, Sunglass Hut has not raised a substantial question whether Apfel anticipates the '902 patent claims. Of course, as the litigation progresses Sunglass Hut may try to present even more evidence (*e.g.,* physical measurements of the lenses Apfel describes) that Apfel's metal layer 26 is "semireflective" and that Apfel's disclosed lenses otherwise satisfy all of the claim limitations.

### 2. *Foster Grant*

Sunglass Hut next argues that certain sunglass lenses sold by Foster Grant more than one year before the filing of King's application are prior art to the '902 patent under 35 U.S.C. § 102(b). To support this assertion, Sunglass Hut submitted a number of declarations describing the Foster Grant lenses. According to Sunglass Hut, those declarations corroborate each other and are corroborated by contemporaneous memoranda. Sunglass Hut contends that the court failed to recognize that corroboration and, moreover, misread the declarations when it found that the Foster Grant lenses were like those depicted in Figure 5(b) in the '902 patent and therefore lacked a "vivid colored appearance."

Oakley responds that the declarations do not establish that the reflectance of the middle layer and thickness of the dielectric layer in the Foster Grant lenses created a differential effect, as claim 1 requires. Oakley also contends that the supposed corroboration is similarly deficient, and that the declarations cannot cross-corroborate each other.

We agree with Oakley that the district court's finding that the Foster Grant declarations fail to raise a substantial question of anticipation is not clearly erroneous. While the Foster Grant declarations do state that the Foster Grant prior art lenses had a "vivid colored appearance" produced by a "differential effect between light reflected from the dielectric and light transmitted through the dielectric and reflected from the semireflective [chromium layer]," *e.g.,* Declaration of Theodore A. Haddad at 5, *Oakley,* (No. SA CV 01–1065 AHS), such statements are conclusory. For example, no basis is provided to explain why the chromium layer is asserted to be "semireflective." Moreover, the declarations fail to address whether the thickness of the dielectric layer is causally related to the alleged differential effect. As another example, there is no quantitative assessment of the differential effect to support the conclusion that a "vivid colored appearance" is produced.

Because the Foster Grant declarations are facially deficient, whether corroborated or not, we need not address the corroboration issue. We caution again that our decision on this issue at this stage in the case carries no implication that Sunglass Hut cannot prevail on the merits after fuller development of the evidence.

We have considered Sunglass Hut's other arguments concerning the validity of the '902 patent, including its argument that it raised a substantial question of obviousness under 35 U.S.C. § 103. Those arguments are not persuasive at this stage, and we now conclude that Oakley is reasonably likely to succeed on the merits at trial against all of Sunglass Hut's validity challenges.

## C. Infringement

The preliminary injunction against Sunglass Hut can be upheld only if Oakley has demonstrated a reasonable likelihood of prevailing on the infringement issue at trial. *See Amazon.com*, 239 F.3d at 1350–51, 57 USPQ2d at 1751. Oakley can meet that burden, once the construction of the relevant claim limitations has been settled, with evidence that each claim limitation is likely present in the accused lenses. *See id.*

 In this case, we, not the district court, have provided the construction of one of the relevant claim limitations—"vivid colored appearance." Because the parties before the district court did not have the benefit of our construction in terms of quantitative differential effect, Oakley did not present evidence of infringement tracking that construction; nor did Sunglass Hut have an opportunity to respond to the infringement issue in terms of that construction. Rather than construing the language and determining whether the accused lenses meet that aspect of the claims, the district court focused its infringement analysis on the structure of the accused lenses. In particular, the court made factual findings regarding the thickness of the accused's dielectric layer, *Oakley*, 61 USPQ2d at 1662 (paragraph 23), and the reflectivity of the accused's semi-reflective layer, *id.* at 1663 (paragraph 28). Sunglass Hut does not challenge those findings. Accepting those findings, we are faced with the question whether it is reasonably likely that the patentee would establish at trial that the accused lenses satisfy the "vivid colored appearance" limitation as we have construed that language. If so, then remand would be an inefficient use of judicial resources.

We conclude that the court's undisputed factual findings do establish that Oakley has indeed shown a likelihood of infringement. In making the pertinent factual findings regarding the structure of the accused lenses, the district court relied heavily on the declaration of Oakley's optics expert, Dr. Jack Feinberg. As explained in the part of that declaration cited by the court, the thickness of the dielectric layer and the reflectivity of the semireflective layer in the Sunglass Hut lenses are within the same ranges as the embodiments disclosed in the '902 patent's specification. Because those disclosed embodiments have a differential effect sufficient to produce a "vivid colored appearance," the accused lenses should necessarily also exhibit a differential effect that produces a "vivid colored appearance." It follows that Oakley's evidence of structural similarity is indirect evidence of a sufficiently high differential effect. Thus, the district court's factual findings support its conclusion that the accused lenses are likely to infringe.

Sunglass Hut argues that the prosecution history limits the meaning of the phrase "vivid colored appearance" to color peaks having a magnitude greater than those depicted in Apfel's Figure 4. Because the accused lenses have smaller color peaks, Sunglass Hut contends that they cannot infringe. Oakley responds that Sunglass Hut did not propose such a con-

struction to the district court, and that we should therefore not consider it. Oakley further responds that the prosecution history distinguished Apfel on the basis of the lens structure, not the magnitude of color peaks. Oakley further contends that Sunglass Hut's proposed construction of the phrase "vivid colored appearance" would exclude the preferred embodiment, and that Sunglass Hut has not disputed that the accused lenses are similar to the '902 patent's preferred embodiment.

Sunglass Hut's proposed construction of the phrase "vivid colored appearance" is based on an incorrect reading of the prosecution history. As discussed above, King distinguished his invention from Apfel during prosecution on the basis of the lens structure, specifically the fact that Apfel's middle layer 26 was not "semireflective." Although King also stated that Apfel's "Figure 4 does not indicate a strong color peak," that one vague statement from the prosecution history does not have much bearing on the meaning of the claim phrase "vivid colored appearance," which we derive from the specification's clear teachings, as detailed above. Sunglass Hut has therefore not made convincing arguments that the district court erred in finding a reasonable likelihood that Oakley would succeed on the merits of its infringement assertion.

■ In sum, because Oakley presented evidence sufficient to establish a likelihood of infringement, we affirm the district

court's finding of a likelihood of infringement.[3]

### D. Non–Merits Factors

#### 1. Irreparable Harm

Sunglass Hut principally argues that because Oakley failed to make a strong showing of likely success on the merits, irreparable harm cannot be presumed. Oakley responds that it is entitled to the presumption. Furthermore, Oakley contends that it established actual irreparable harm by evidence of exclusive market share and Sunglass Hut's sizable impending marketing efforts.

■ We agree with Oakley that it has made a sufficiently strong showing of likelihood of success on the merits to entitle it to a presumption of irreparable harm. See Amazon.com, 239 F.3d at 1350, 57 USPQ2d at 1751 ("Irreparable harm is presumed when a clear showing of patent validity and infringement has been made."). While the merits issues discussed above are close, they favor Oakley. Thus, we agree with the district court that Oakley has established a presumption of irreparable harm. In fact, because the district court found that Sunglass Hut was poised to release "huge numbers" of the enjoined sunglasses, Oakley, 61 USPQ2d at 1668, the presumption is well-supported. That finding is not clearly erroneous.

#### 2. Balance of Hardships

■ Sunglass Hut argues that the court performed no true balancing when

---

**3.** Although we uphold the court's finding of a likelihood of infringement, we caution that we do so under a claim construction that is preliminary. Just as a district court can issue "tentative" or "rolling" claim constructions when "faced with construing highly technical claim language on an expedited basis," such as in a preliminary injunction proceeding, *Jack Guttman, Inc. v. Kopykake Enters., Inc.,*

302 F.3d 1352, 1361, 64 USPQ2d 1302 (Fed. Cir.2002), our claim construction is based on the same preliminary record and is therefore likewise preliminary. We also note that, even assuming the district court retains our claim construction at trial, Oakley's proof of infringement and Sunglass Hut's arguments for noninfringement may be augmented.

the court likened Sunglass Hut's hardship to that of the typical infringer. According to Sunglass Hut, it is the party suffering irreparable harm by having to recall products on the shelf. Oakley responds that the court did properly balance the hardships, and that Sunglass Hut's claim of irreparable harm on its part is belied by its press release following the issuance of the TRO admitting that sales to that point had been "insignificant."

We conclude that the court's factual finding regarding the balance of hardships is not clearly erroneous. The court expressly acknowledged that the injunction would cause Sunglass Hut some hardship, *id.*, but the court determined that the harm to Oakley without issuance of the injunction would be greater. That determination was supported by ample evidence and was not clearly erroneous.

### E. *Adequacy of the Injunctive Order Under Rule 65(d)*

 Sunglass Hut's final argument is that the injunctive order does not satisfy the specificity requirement of Fed.R.Civ.P. 65(d) because Sunglass Hut does not sell lenses or sunglasses denominated "Ice (blue)" or "Emerald (green)," which are Oakley's trade names. Sunglass Hut further contends that the order is not limited to the accused lenses, nor does it specify which shades of green or blue are infringing. According to Sunglass Hut, its recall may have been too broad or too narrow, and the order's vagueness prevents it from designing around the patent.

Oakley responds that the order's reference to colors is sufficiently specific, and that the order is clear in the context of the record in this case. Moreover, according to Oakley, Sunglass Hut understands the scope of the order, as evidenced by its response to the TRO.

We agree with Oakley that the order complies with Rule 65(d), which states:

Every order granting an injunction and every restraining order shall set forth the reasons for its issuance, shall be specific in terms, shall describe in reasonable detail, and not by reference to the complaint or other documents, the act or acts sought to be restrained. . . .

Fed.R.Civ.P. 65(d). The purposes of that rule are to minimize confusion as to how the enjoined party can conform its conduct with the order, *Int'l Longshoremen's Ass'n, Local 1291 v. Phila. Marine Trade Ass'n*, 389 U.S. 64, 74, 88 S.Ct. 201, 19 L.Ed.2d 236 (1967), and to minimize needless contempt proceedings, *Additive Controls*, 986 F.2d at 480, 25 USPQ2d at 1801. We have held that an injunctive order runs afoul of Rule 65 when it "does not use specific terms or describe in reasonable detail the acts sought to be restrained" and it "does not limit its prohibition to the manufacture, use, or sale of the specific infringing devices, or to [those] no more than colorably different from the infringing devices." *Id.* at 479, 25 USPQ2d at 1801. We have even upheld an injunctive order employing nonspecific language on the ground that the detailed record of the case ameliorated any risk of unwarranted contempt actions. *Signtech USA*, 174 F.3d at 1359, 50 USPQ2d at 1377 (holding that an injunction prohibiting "any further infringement of the . . . patent" complies with Rule 65(d)).

The language of the present order is sufficiently specific. It is true that it is directed only at Sunglass Hut products having two particular types of lenses, designated by trade names of Oakley: "Emer-

ald (green)" and "Ice (blue)." *Oakley,* 61 USPQ2d at 1669. Thus, the order's reference to Oakley's "Emerald" and "Ice" trade names in relation to Sunglass Hut's products is arguably incorrect as a technical matter; however, such a flaw amounts to no more than a harmless error. Indeed, Sunglass Hut fully understood the same language appearing in the TRO. *See Oakley Inc. v. Sunglass Hut Int'l,* No. SA 01–1065 at 3 (C.D.Cal. Nov. 20, 2001) (Temporary Restraining Order and Order to Show Cause Why a Preliminary Injunction Should Not Issue). Sunglass Hut publicly commented in a press release the following day that the TRO "applie[d] to only three models." Thus, the record of the case and the conduct of the parties demonstrate that the language of the preliminary injunction is not unclear to Sunglass Hut.

Sunglass Hut's argument that it cannot with any degree of certainty attempt to design around the preliminary injunction likewise fails in light of the record of this case. Whether Sunglass Hut can redesign the two types of enjoined lenses such that they are not likely to be found infringing is an open question. If, for example, Sunglass Hut can produce lenses having a demonstrable maximum differential effect less than about 5.45%, such lenses would not literally infringe the '902 patent claims by failure to have a "vivid colored appearance," as we have construed that phrase for purposes of the preliminary injunction. The district court might conclude that such a redesign is not reasonably likely to infringe the '902 patent. In any event, the wording of the order is sufficiently clear and leaves open to Sunglass Hut such avenues of argument.

In sum, we perceive no legal error in the district court's wording of the preliminary injunction.

## CONCLUSION

The district court did not abuse its discretion in granting the preliminary injunction, and the injunctive order complies with Rule 65(d). Accordingly, we

**AFFIRM.**

DYK, Circuit Judge, concurring.

This is a close and difficult case. I generally agree with the majority opinion, but write separately to emphasize three points. First, the majority's tentative claim construction in response to the indefiniteness argument may or may not be correct. Presumably at trial those of ordinary skill in the art will testify as to whether the specification should be so interpreted by the skilled artisan. At the preliminary injunction stage the claims enjoy a presumption of validity. Appellants have not shown that a person having ordinary skill in the art could not interpret the language of the claims in a sufficiently definite manner. That skilled artisan would have the details provided in the written description including specific examples. The record before us, in view of the presumption of validity of the claims, is simply insufficient for us to conclude that Oakley has failed to meet its burden of showing a likelihood of success on the merits of the validity of the claims under 35 U.S.C. § 112, ¶ 2, or that appellants have raised a "substantial question" of invalidity. *Amazon.com, Inc. v. Barnesandnoble.com, Inc.,* 239 F.3d 1343, 1358–59 (Fed. Cir.2001).

Second, in my view, we should not be applying a new claim construction to the facts of this case to uphold a district court's discretionary preliminary injunction as the majority does, *ante* at 1344. *See Bell & Howell Document Mgmt.*

*Prods. Co. v. Altek Sys.*, 132 F.3d 701, 708, 45 USPQ2d 1033, 1040 (Fed.Cir.1998) ("Because the district court determined the likelihood of infringement based on an incorrect claim construction, we must remand for a determination whether [plaintiff] has shown that it will likely succeed in proving infringement."); *see also Guttman v. Kopykake Enters.*, 302 F.3d 1352, 1362, 64 USPQ2d 1302, 1309 (Fed.Cir.2002) (refusing to remand to the district court with instructions to enter a preliminary injunction because "the trial court has not yet passed on whether, under the proper claim construction, [the patentee] is likely to show infringement [and] the resolution of this issue necessarily involves factual determinations that rest within the province of the trial court, not the appellate court"). However, it is sufficient to establish a likelihood of success on infringement at this stage that there was expert testimony that the accused lenses had a vivid colored appearance, and no evidence to the contrary. *Oakley Inc. v. Sunglass Hut Int'l*, 61 USPQ2d 1658, 1662–63 (N.D.Cal.2001). Appellants offered no claim construction at the preliminary injunction stage. There was no error on the part of the district court in failing to provide an explicit formal claim construction. The district court sufficiently performed its obligation when applying the facts to the claims as presently understood by the district court. *See Sofamor Danek Group, Inc. v. DePuy–Motech, Inc.*, 74 F.3d 1216, 1221, 37 USPQ2d 1529, 1532 (Fed.Cir.1996) ("[T]he trial court has no obligation to interpret [a claim] conclusively and finally during a preliminary injunction proceeding.... A trial court may exercise its discretion to interpret the claims at a time when the parties have presented a full picture of the claimed invention and prior art."). The appellants' sole argument against infringe-ment was that it was practicing the prior art, which we have held is not a defense to infringement. *Tate Access Floors, Inc. v. Interface Architectural Res., Inc.*, 279 F.3d 1357, 1366, 61 USPQ2d 1647, 1654 (Fed. Cir.2002).

Finally, the parties at trial are free to offer new claim constructions to the district court and evidence as to why the accused lenses do or do not infringe under those claim constructions. *Guttman*, 302 F.3d at 1361, 64 USPQ2d at 1308 ("[A]ll findings of fact and conclusions of law at the preliminary injunction stage are subject to change upon the ultimate trial on the merits.").